**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | |
|---|---|
| NEAL HOUSTON, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:06-CV-60 CAS |
| CHARLES DWYER, et al., | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on separate motions for summary judgment filed by defendant Charles Dwyer and defendants Glenn Babich, Warren Moore, Stephanie Kasting, Michael Hakala, and Elizabeth Conley. Plaintiff opposes the motions. For the following reasons, the Court concludes that defendants' motions for summary judgment should be granted.

**I.      Background.**

This is an action for deprivation of constitutional rights pursuant to 42 U.S.C. § 1983, which alleges deliberate indifference to a serious medical need. Plaintiff Neal Houston is an inmate of the Missouri Department of Corrections currently confined at the South Central Correctional Center located in Licking, Missouri. Plaintiff's allegations relate to his period of incarceration from January 2005 until August 2005 at the Southeast Correctional Center ("SECC"), located in Charleston, Missouri. Defendants are Dr. Michael Hakala, Dr. Glenn Babich, Warren Moore, RN, Stephanie Kasting, RN, Elizabeth Conley, Director of Correctional Medical Services (collectively the "Medical Defendants"), and Charles Dwyer, Superintendent of SECC. Plaintiff's third amended complaint, filed by appointed counsel, alleges that plaintiff was denied care for a serious medical condition

between January 2005 and August 2005. Plaintiff alleges that beginning January 1, 2005, he experienced intense, severe, and progressively worsening abdominal pain; he began to suffer nausea and vomiting; his bowel and bladder functions were impaired; he suffered blackouts; he suffered an inability to sleep caused by pain; and, over a six-month period from January 1, 2005 to July 1, 2005, he lost in excess of seventy pounds of body weight. Plaintiff alleges that he complained of these medical conditions to the defendants and requested medical treatment, but his requests were ignored or responses were delayed. Plaintiff also alleges the medical care and treatment was inadequate to diagnose his condition or to cure and relieve his symptoms. As a result, plaintiff alleges he developed a fibrous retroperitoneal tumor that impaired his renal function and necessitated multiple surgeries and extended hospitalizations. Plaintiff seeks damages in the amount of one million dollars ($1,000,000.00), an additional one million dollars ($1,000,000.00) in punitive damages, and his attorneys' fees and costs.

**II.     Legal Standard**.

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing

there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063, (1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

**III.   Facts**.

Plaintiff's claims arise from his confinement at SECC from January 1, 2005 until his transfer in July 2005. Defendant Dr. Michael Hakala is a licensed physician employed by Correctional Medical Services, Inc. ("CMS") as an independent contractor physician at SECC. Defendant Dr. Glenn Babich is a licensed physician employed by CMS as an independent contractor physician and as the Medical Director at SECC. Defendant Stephanie Kasting is a registered nurse employed by CMS as a nurse and Health Services Administrator at SECC. Defendant Warren Moore is a

registered nurse employed by CMS as a nurse at SECC. Defendant Dr. Elizabeth Conley is employed as the Regional Medical Director by CMS.

**Medical Care Provided by Dr. Michael Hakala, Dr. Glenn Babich, Stephanie Kasting, RN, and Warren Moore, RN**.

Dr. Hakala was considered plaintiff's primary care provider at SECC. He first saw plaintiff on January 13, 2005 in the administrative segregation unit. Plaintiff requested to change his medications from Naprosyn to Ibuprofen and also for a refill of Tums. Dr. Hakala did not chart any stomach complaints during this visit, and did not recall plaintiff making any complaints about his stomach on this visit.[1]

Dr. Hakala treated plaintiff again on January 18, 2005 for stomach complaints and dark stool. He assessed plaintiff's vital signs, performed a physical, abdominal and prostate examination, and a guaiac test to determine if blood was present in plaintiff's stool. Dr. Hakala charted that plaintiff told

---

[1]In his response to defendants' statement of uncontroverted material fact, plaintiff states: "Plaintiff maintains that, during all his visits with Dr. Hakala he complained of stomach pains, vomiting, passing blood and back pains." (Pl. SOF 15) (emphasis added). Plaintiff cites to his deposition testimony on pages 14 and 15. Plaintiff's deposition testimony, however, does not support his statement. It also does not call into question the medical records, which reflect that plaintiff made no complaint about his stomach during his January 13, 2005 visit with Dr. Hakala. Plaintiff's testimony establishes merely that throughout his five-month period of treatment by Dr. Hakala, he complained of stomach pains, vomiting, passing blood, and back pains. Plaintiff's testimony does not create a factual dispute regarding whether he complained of a particular symptom on a particular visit with Dr. Hakala.
    Q:    [M]y question wasn't clear. I meant when you filled out your M.S.R. and you met with Dr. Hakala as your treating physician, what were your symptoms or medical complaints that you made to him?
    A:    I had severe stomach pains, I was throwing up my food, passing blood through stool and the urine and I had back pains.
    Q:    And you've listed a variety of medical symptoms, those complaints occurred throughout that seven month period, is that true?
    A:    Yes.
Pl. Dep. at 14-15.

him that plaintiff was eating well and had not vomited. Plaintiff weighed 205 pounds. During the examination, Dr. Hakala found no masses, hemorrhoids, or blood in plaintiff's stool. Plaintiff's vital signs were normal. Dr. Hakala diagnosed plaintiff with constipation, and prescribed Metamucil and Psyllium. He requested to see plaintiff in two weeks for a follow-up visit. He also requested three more stool samples.

On January 26, 2005, plaintiff underwent blood testing and lab work. The following day, a prison nurse saw plaintiff in response to a self-declared medical emergency for complaints of stomach pain and constipation. The nurse noted that plaintiff complained of abdominal pain and that he had difficulty eating for the preceding two to three days. The nurse assessed plaintiff's vital signs, recorded his weight at 208 pounds, and noted the presence of bowel sounds. She recommended a follow-up visit with Dr. Hakala.

Dr. Babich first treated plaintiff on January 28, 2005 for complaints of abdominal pain and difficulty eating. Plaintiff denied suffering any nausea, vomiting, diarrhea, or blood in his stool. Dr. Babich reviewed plaintiff's x-rays, which showed increased stool and gas in plaintiff's colon. He assessed plaintiff's abdomen, bowels, liver, kidney, and spleen. Dr. Babich noted the presence of a hemorrhoid and a normal prostate. He diagnosed plaintiff with constipation, and ordered stool softeners, laxatives, bulking agents, juices and fluids. He also ordered x-rays of plaintiff's abdomen, lab work, and a urinalysis.

On January 28, 2005, plaintiff had two x-rays taken of his abdomen. He also had blood tests and a urinalysis performed. On January 31 and February 1, plaintiff's additional stool samples were negative for blood.

On February 1, 2005, plaintiff saw Dr. Hakala to request a refill of antacid for heartburn. Plaintiff made no complaints of abdominal pain. Dr. Hakala reviewed plaintiff's negative guaiac tests for blood in his stool, assessed plaintiff's existing hemorrhoid, and reviewed plaintiff's abdominal x-rays. He diagnosed plaintiff with constipation and continued plaintiff on his medications.

On February 4, 2005, Nurse Kasting saw plaintiff for complaints of mid-abdominal pain. She noted that Dr. Hakala had seen plaintiff for his stomach complaints. She took plaintiff's vital signs and obtained a urine sample through a catheter, which showed traces of blood and leukocyte. Nurse Kasting informed Dr. Hakala of the results.

The next day, February 5, 2005, Dr. Hakala saw plaintiff for complaints of lower abdominal pain. Plaintiff did not have a fever, and he had bowel tones in all quadrants. Plaintiff did not complain of any urinary problems. Dr. Hakala diagnosed plaintiff with a urinary tract infection and low abdominal pain. He prescribed antibiotics to treat the urinary tract infection. He also prescribed Tylenol, and increase in fluids, and an increase in Metamucil.

On February 7, 2005, Dr. Babich was informed that plaintiff was trading or selling his extra juices to other inmates, and Dr. Babich discontinued his order for additional juices and Psyllium. Dr. Babich prescribed plaintiff with lactulose as an alternative.

On February 8, 2005, at 1:30 p.m., nursing staff administered the lactulose to plaintiff without incident. At 2:00 p.m., plaintiff self-declared a medical emergency for a stomachache. He reported that his stomachache occurs after he takes his medications. He reported no complaints of nausea, vomiting, or problems voiding.

On February 15, 2008, Dr. Hakala treated plaintiff for continued complaints of stomach pain, difficulty eating and urinating. He performed a physical examination, which revealed a soft abdomen,

clear lungs, a regular heart and good skin turgor. Dr. Hakala reviewed plaintiff's x-rays showing a non-obstructive gas pattern and plaintiff's lab work showing a slight elevation in a liver enzyme. Plaintiff weighed 195 pounds.[2] Dr. Hakala diagnosed plaintiff with abdominal pain of an unknown etiology. According to Dr. Hakala, plaintiff's complaint of difficulty urinating and the presence of white blood cells could have been caused by a prostate or urinary tract infection, for which Dr. Hakala prescribed antibiotics.

According to both Drs. Hakala and Babich, the slight elevation of plaintiff's liver enzymes could have been caused by plaintiff's psychiatric medications. Plaintiff's psychiatrist did not want to remove plaintiff from these medications.

Dr. Hakala next saw plaintiff on February 17, 2005 for a self-declared medical emergency of low abdominal pain, loose stool, and intermittent burning during urination. Dr. Hakala's exam showed soft bowel sounds and the same or similar urinalysis results showing white cells and small amount of protein. At this time, Dr. Hakala suspected a diagnosis of urethritis (i.e., an inflammation of the urethra) or cystitis (i.e., the inflammation of the urinary bladder). He ordered a urine culture to determine if plaintiff was resistant to the antibiotic.

On February 22, 2005, plaintiff saw Dr. Hakala for continued complaints of low abdominal pain. Plaintiff informed Dr. Hakala that he had chronic and persistent lower abdominal pain. Dr. Hakala's exam found tenderness in the lower quadrant, with no palpable mass, and no rebound or right side pain. He reviewed plaintiff's urine culture results. Plaintiff denied any problems urinating. Dr. Hakala concluded that plaintiff was still experiencing some constipation. He also considered a

---

[2]Dr. Babich testified that plaintiff's height is 5 feet, 6 inches, and his ideal weight is between 136 and 168. See Babich Dep. at 15. Plaintiff disputes this fact, but provides no citation to the record for support of his statement in accordance with Local Rule 4.01(E).

diagnosis of diverticulitis, which is an inflammation of the pocket of the sigmoid and left lower quadrant of the colon.

Following his February 22, 2005 examination, Dr. Hakala recommended additional abdominal x-rays, a rectal examination, and a barium enema. The x-ray showed constipation and an existing deformity of the lower spine.

On March 8, 2005, Dr. Hakala saw plaintiff for complaints of abdominal pain on the left side and limited bowel movements. Dr. Hakala assessed plaintiff's medication, his negative urine cultures, and the most recent x-ray. Dr. Hakala requested and was approved for plaintiff to undergo additional Hepatitis testing, a follow-up abdominal x-ray, and a referral to the Chronic Care Clinic ("CCC") to monitor his Hepatitis. On March 10, plaintiff underwent additional Hepatitis testing.

On March 11, 2005, x-rays of plaintiff's abdomen showed non-specific gastrointestinal air pattern.

On March 12, 2005, Nurse Moore saw plaintiff in response to a self-declared medical emergency for chest pain and recurring abdominal pain and a demand for Ibuprofen. Nurse Moore assessed plaintiff and concluded that his medical complaints were not a medical or life threatening emergency. He informed plaintiff that he could take Tylenol, but that he did not meet the criteria for Ibuprofen.

On March 29, 2005, Dr. Hakala saw plaintiff for a stomach complaint. He performed an examination, assessed plaintiff's medications and his condition. Plaintiff weighed 185 pounds, which represents a 23 pound weight loss from January 27, 2005. The medical records reflect that plaintiff was in no apparent distress. Dr. Hakala diagnosed plaintiff with constipation and Hepatitis C. Dr. Hakala recommended plaintiff seek treatment in the CCC for his Hepatitis C, increase his fluid intake

and activity, and he also requested additional lab tests to assess the age of plaintiff's Hepatitis. On this same date, Dr. Babich and an infectious disease nurse saw plaintiff to assess his Hepatitis and to enroll him in the CCC. Dr. Babich performed an abdominal examination that revealed normal findings.

On April 19, 2005, Dr. Hakala performed a required physical examination of plaintiff. Medical staff also saw plaintiff on the following dates for his medical complaints: April 7, 14, and 25 and May 3, 10, and 14. Based on the medical records, plaintiff complained of back pain and stomach pain on April 25. On May 3, he complained of stomach pain, back pain, and testicle pain. On May 10, he complained of stomach and genital pain. On May 14, the records reflect that plaintiff complained of chest pain radiating down his left arm. On May 17, 2005 Dr. Hakala was unable to see plaintiff due to insufficient custody.

Dr. Hakala next saw plaintiff on May 24, 2005 for complaints of stomach and left testicular pain. Plaintiff denied vomiting and appeared in no distress. Dr. Hakala performed a physical examination and found no hernia or varicosities. He noted a 36-pound weight loss and some tenderness on the top of the left testicle. He attributed the tenderness to epididymitis, a common inflammation on the top of the testicle.

Dr. Hakala and Dr. Babich discussed plaintiff's medical condition and also plaintiff's two recent high blood pressure readings. Dr. Babich recommended plaintiff undergo a CT scan, which is a more sophisticated test than a colonoscopy. A CT scan assesses both the abdomen and kidneys.

On May 25, Dr. Hakala requested and was approved for plaintiff to undergo a CT scan, and he also ordered additional lab work. Dr. Hakala assessed plaintiff's stomach complaints and lab results on June 7, 2005. Plaintiff's physical exam, liver enzymes, and PSA amylase were all normal.

On June 10, 2005, plaintiff was transported from SECC for his CT scan. The CT scan results showed a retroperitoneal infiltration process with an obstruction at the left kidney. A retroperitoneal fibrosis is a rare condition. Plaintiff's two high blood pressure readings were not related to this condition. Dr. Babich testified that plaintiff's complaint of an inability to urinate is more commonly a sign of a problem at the bladder, penis, or prostate.

According to both Drs. Hakala and Babich, plaintiff showed no indication or signs consistent with a retroperitoneal fibrosis. A sign or symptom of retroperitoneal fibrosis could include pain that reflects backward, although the condition can be present without back pain. The medical records reflect that plaintiff never complained of back pain to Dr. Hakala, although he complained of back pain to other medical personnel. Dr. Hakala testified that current literature would not list abdominal pain as a symptom of retroperitoneal fibrosis.

On June 14, 2008, Dr. Hakala requested and was approved for plaintiff to undergo surgery to address the obstruction. On June 28, plaintiff was transported to see a specialist, Dr. Carl Doerhoff, who recommended a biopsy of the mass. On July 12, 2005, Dr. Doerhoff performed a diagnostic laparoscopy biopsy of the mass, but was unable to diagnose the mass. Drs. Babich and Hakala saw plaintiff on July 13 and 14, respectively, to assess his recovery.

On July 15, 2005, Dr. Hakala requested and was approved for plaintiff to undergo additional diagnostic testing. Plaintiff was seen by Dr. Hakala or Dr. Babich on July 21, 22, and 25, 2005. Dr. Babich had no further involvement in plaintiff's care after July 25, 2005. Dr. Hakala had no further involvement in plaintiff's care after July 26, 2005.

Plaintiff admits that throughout the relevant time period, he was seen at least twice daily by nursing staff in the administrative segregation unit to provide him with his medications. He admits

he received his medication on a regular basis. Moreover, plaintiff does not dispute that medical staff saw him on a regular basis, but here merely disagrees with the treatment provided at SECC.

### Plaintiff's Inmate Grievance Filings at SECC Related to Defendants Stephanie Kasting and Dr. Elizabeth Conley

Plaintiff filed an Informal Resolution Request ("IRR") against Nurse Moore concerning the March 12, 2005 incident. Debbie Vinson, the Director of Nursing, responded to plaintiff's IRR, SECC-05-379, and concluded that plaintiff's complaint did not meet the criteria for a medical emergency.

Plaintiff also pursued an Offender Grievance concerning his grievance against Nurse Moore, wherein plaintiff complained that Nurse Moore "failed to do his job" to treat plaintiff's medical emergency. On May 20, 2005, Stephanie Kasting prepared a written response to plaintiff's Offender Grievance, in which she also concluded that plaintiff's complaint did not meet the criteria for a medical emergency. Ms. Kasting also noted that since plaintiff's transfer to SECC on January 4, 2005, he had been seen by a nurse 33 times and treated by a doctor 17 times for his stomach complaints.

In June 2005, plaintiff filed an Offender Grievance Appeal concerning SECC-05-379, which was denied. Dr. Conley signed and reviewed the denial of plaintiff's Offender Grievance Appeal Response. Dr. Conley also denied plaintiff's Offender Grievance Appeal, SECC-05-230, requesting to see a specialist for a urinary problem because plaintiff had already been sent for his CT scan, and plaintiff's medical records revealed that he had been seen by a physician over 18 times and had over 100 nursing encounters in less than six months at SECC. Dr. Conley also denied plaintiff's grievance appeal, SECC-05-232, because it was duplicative of grievance SECC-05-230.

Dr. Conley also denied plaintiff's grievance appeals SECC-05-314, SECC-05-380, SECC-05-438, SECC-05-517, and SECC-05-577. Based on the undisputed facts, these denials were largely because the complaints were moot and plaintiff had already received the care he was complaining about. See Def. SOF ¶¶ 137-141.

**IV.  Discussion**.

    A.    The Medical Defendants' Motion for Summary Judgment

The Medical Defendants move for summary judgment asserting they are entitled to judgment because plaintiff was not denied treatment for his condition. Defendants state that they and other healthcare providers acknowledged and treated plaintiff on numerous occasions for his chronic stomach complaints, constipation, and other medical concerns. Defendants state plaintiff received ongoing prescription medications, diagnostic testing, multiple abdominal x-rays, a CT scan, and was referred to a specialist, Dr. Carl Doerhoff. Moreover, defendants argue that based on undisputed material facts, plaintiffs's alleged stomach problems and related complaints were not consistent with or caused by the presence of a retroperitoneal fibrosis.

Plaintiff's claim of deliberate indifference to a serious medical need is properly evaluated under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference to the serious medical needs of prisoners constitutes an "unnecessary and wanton infliction of pain" which is proscribed by the Eighth Amendment. See Estelle, 429 U.S. at 105 (citations and internal quotations omitted). The Eighth Circuit has set forth the parameters of an Eighth Amendment claim for deliberate indifference to serious medical needs:

> An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component. Coleman, 114 F.3d [778] at 784 [(8th Cir. 1997)]. See also Farmer v.

Brennan, 511 U.S. 825 (1994). The plaintiffs must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs. Coleman, 114 F.3d at 784. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992). "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Id. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. Estelle, 429 U.S. at 104-05. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. Id. at 106.

Dulhany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).

The parties do not dispute that plaintiff had an objectively serious medical need. As such, the first element of plaintiff's deliberate indifference claim has been satisfied. The Court will therefore limit its discussion to the second prong of the Farmer test, the subjective component, that defendants were deliberately indifferent to that need.

**Deliberate Indifference**

A prison official exhibits deliberate indifference when the official actually "knows of and disregards" a prisoner's serious medical needs. Farmer, 511 U.S. at 837; Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Medical malpractice is not actionable under the Eighth Amendment. Smith v. Clarke, 458 F.3d 720, 724 (2006). For a claim of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment

- 13 -

decisions does not rise to the level of a constitutional violation." Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (9th Cir. 2008) (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)). Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct. Id.

"It is well settled that an intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the Eighth Amendment." Ruark v. Drury, 21 F.3d 213, 216 (8th Cir.), cert. denied, 513 U.S. 813 (1994). "For delay to rise to an actionable Eighth Amendment violation, however, the information available to the prison official must be such that a reasonable person would know that the inmate requires medical attention, or the prison official's actions (or inaction) must be so dangerous to the health or safety of the inmate that the official can be presumed to have knowledge of a risk to the inmate." Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Dulaney, 132 F.3d at 1239.

The Medical Defendants assert that plaintiff cannot show deliberate indifference because he was receiving appropriate treatment for his symptoms during the period in which he claims a delay in treatment. Plaintiff argues, however, that he was subject to extreme pain and suffering for a prolonged period of time because of defendants' "failure to utilize a common and widely available diagnostic tool," presumably a CT scan. Whether a prison's medical staff deliberately disregarded

- 14 -

the needs of an inmate is a factually-intensive inquiry.  See Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997).

The Court has conducted such a factually-intensive inquiry.  To summarize the factual record (as more fully set forth in Part III, supra), the uncontroverted facts show that plaintiff was examined and treated by Dr. Hakala on eleven occasions from January 13, 2005 through May 24, 2005, when the CT scan was ordered.  During this time, plaintiff was also examined and treated by Dr. Babich on three occasions.  He was examined and treated by the prison nursing staff on at least twelve occasions.  Additionally, he was seen by the administrative segregation nursing staff at least twice daily, and usually three to four times daily.  Between January 13 and May 24, 2005, Drs. Hakala and Babich ordered blood testing and lab work on four occasions; ordered three sets of x-rays of plaintiff's abdomen; ordered three urinalyses and one urine culture; ordered additional Hepatitis testing; and referred plaintiff to the Chronic Care Clinic.  In May 2005, Dr. Hakala noted plaintiff's weight loss and consulted with Dr. Babich about plaintiff's medical condition.  On May 25, 2005, Drs. Hakala and Babich discussed plaintiff's medical condition, and ordered a CT scan, the results of which showed a retroperitoneal infiltration process with an obstruction of the left kidney.

It is clear from the record that the Medical Defendants responded to plaintiff's requests for medical attention for his abdominal pain.  Plaintiff does not deny that he received the evaluations, testing, and treatment discussed above.  Despite the amount of treatment plaintiff received during these four months, his condition was not diagnosed until a CT scan on June 10, 2005.  Defendant argues that defendants' failure to order the CT scan earlier establishes deliberate indifference to his serious medical needs.  The Court cannot find, however, any evidence to suggest that defendants knew of plaintiff's need for a CT scan and consciously disregarded this need.  Based on the expert

testimony of plaintiff's treating physicians, plaintiff did not exhibit any indications or signs of a retroperitoneal fibrosis or any indications or signs of a condition requiring a CT scan, prior to May 24. Even when the doctors ordered the CT scan, they were not suspicious of a retroperitoneal fibrosis.

According to both Drs. Hakala and Babich a retroperitoneal fibrosis is a rare condition that neither doctor had seen before in their combined 43 years of practice. Dr. Hakala testified that to diagnose the condition, he would look only for a complaint of back pain. He stated that the current medical literature would not list abdominal pain as a symptom of the condition. The doctors testified that they ordered the CT scan because of plaintiff's weight loss, his persistent abdominal pain, his Hepatitis (which would require the doctors to examine the liver), and his two elevated blood pressure readings. Dr. Babich testified that the doctors did not have any suspicion that there was any problem with plaintiff's kidneys at the time they ordered the CT scan because plaintiff had not had any complaints consistent with a kidney problem. Further, Drs. Hakala and Babich testified that a retroperitoneal fibrosis is a rare condition. In his 22 years of practice, Dr. Hakala testified that he had never seen this condition before plaintiff. Similarly, Dr. Babich testified that in his 21 years of practice, he had never seen this condition.

Based on this testimony, the Court cannot find that the Medical Defendants knew of and disregarded plaintiff's serious medical needs. It appears from the record that plaintiff presented with atypical symptoms, and the diagnosis was difficult. The Medical Defendants performed numerous tests to determine the proper treatment, and they continuously tried different methods and medications to treat his pain. Thus, the record shows a mere disagreement with the course of treatment, and does not support a conclusion that the Medical Defendants were deliberately

indifferent to plaintiff's medical needs. See Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118-19 (8th Cir. 2007) (inmate has no constitutional right to particular course of treatment, and his mere disagreement with medical treatment is no basis for § 1983 liability); Pietrafeso v. Lawrence County, S.D., 452 F.3d 978, 983 (8th Cir. 2006) (showing of deliberate indifference is greater than even gross negligence and requires more than mere disagreement with treatment decisions); Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors were not deliberately indifferent because they treated prisoner on numerous occasions and offered sensible medication and treatment). Plaintiff has failed to offer evidence, as opposed to legal argument and his own unsupported opinions, that the course of treatment he received was so grossly incompetent or so deviated from professional standards that it amounted to deliberate indifference in violation of his Eighth Amendment right to be free from cruel and unusual punishment. See Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).

Plaintiff also argues that the time lapse between when the CT scan was ordered and when the CT scan was performed, two weeks, shows deliberate indifference. He also states that after the CT scan revealed the retroperitoneal fibrosis, it took another month for plaintiff to be referred to a qualified surgeon.

The undisputed facts show that on May 25, 2005, Dr. Hakala requested and was approved for plaintiff to undergo the CT scan. The CT scan was performed on June 10, 2005. Dr. Hakala reviewed the results on June 13, 2005. On June 14, 2005, Dr. Hakala requested and was approved for plaintiff to undergo surgery to address the obstruction. On June 28, 2005, plaintiff was transported to see a specialist, Dr. Doerhoff, who recommended a biopsy of the mass. On June 29, 2005, Dr. Hakala requested and was approved for Dr. Doerhoff to perform a biopsy of the mass. On July 5, 2005, Dr. Hakala met with plaintiff to discuss his condition and Dr. Doerhoff's treatment plan,

and on July 12, 2005, Dr. Doerhoff performed the diagnostic laparoscopic biopsy of the mass. See Defs. SOF at ¶¶ 86-89, 100-104. The record reflects the reality that treating a prisoner in an off-site facility requires logistical planning that necessarily involves delays not encountered by non-prison population. See, e.g., Dr. Hakala Dep. at 53 (discussing custodial arrangements). Moreover, plaintiff has not submitted "verifying medical evidence" to establish the detrimental effect of any alleged delay in medical treatment. See Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995).

Finally, based on undisputed facts, the Medical Defendants' responses to plaintiff's inmate grievance filings do not establish any deliberate indifference to his medical needs. The responses show that plaintiff's self-declared emergencies did not meet the criteria for a medical emergency, and that plaintiff's complaints were largely resolved prior to his appeal of the grievance filings. See Def. SOF §§ 124-141; Def. Ex. H at 92-249. Plaintiff argues that based on these complaints, he should have been referred to an outside agency for diagnostic testing and treatment. As discussed above, however, plaintiff's belief that he should have been referred out is merely a disagreement with his course of treatment, and does not rise to the level of deliberate indifference.

Although plaintiff suffered a truly unfortunate condition, the facts in the record do not rise to the level of deliberate indifference. Plaintiff has not made a jury-submissible case, and therefore summary judgment shall be entered in favor of defendants.

### B. Defendant Charles Dwyer's Motion for Summary Judgment

In his third amended complaint, plaintiff alleges defendant Charles Dwyer, Superintendent of SECC, was directly responsible for the operation of SECC and the welfare of its inmates, including providing inmates access to prompt and competent medical care. Plaintiff alleges that Dwyer personally reviewed his inmate complaint forms in which he made requests for medical treatment and

complaints of denial of medical services. Therefore, plaintiff alleges Dwyer was personally involved in the denial of medical treatment. See 3d Am. Compl. at ¶¶ 7, 15.

To establish a claim of supervisory liability, the plaintiff must show that the supervisor was personally involved in the constitutional violation or that the supervisor's inaction amounted to "deliberate indifference" or "tacit authorization" of the violative practices. Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993); Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990). For the reasons discussed in Part IV.A., plaintiff has not shown any constitutional violation based on the medical care and treatment he received during his incarceration at SECC. He cannot, therefore, establish that defendant Dwyer was involved in any constitutional violation or that he showed tacit authorization of any violative practice. Accordingly, defendant Dwyer is entitled to summary judgment on plaintiff's claims.

## V. Conclusion.

For the foregoing reasons, the Court will grant the Medical Defendants and defendant Dwyer's motions for summary judgment, as they have met their burden to establish that no genuine issues of material facts exist and they are entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that defendants Stephanie Kasting, Elizabeth Conley, Michael Hakala, Glenn Babich, and Warren Moore's motion for summary judgment is **GRANTED**. [Doc. 113]

**IT IS FURTHER ORDERED** that defendant Charles Dwyer's motion for summary judgment is **GRANTED**. [Doc. 97]

An appropriate judgment will accompany this memorandum and order.

 

 

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this \_\_\_15th\_\_\_ day of September, 2008.